**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| UNCHARTED LABS, INC. d/b/a Udio.com,<br>Movant,<br>v.<br>MECHANICAL LICENSING COLLECTIVE,<br>Respondent. | Case No. 3:26-mc-00020<br>Chief Judge William L. Campbell, Jr.<br>Magistrate Judge Luke A. Evans |

**RESPONDENT'S OPPOSITION TO**
**MOTION TO ENFORCE COMPLIANCE WITH SUBPOENA**

Respondent Mechanical Licensing Collective ("The MLC") respectfully requests that the Court deny Uncharted Labs, Inc. d/b/a Udio.com's motion to enforce the subpoena at issue. Udio.com seeks to compel a non-party to undertake an unprecedented production effort requiring weeks of employee time to deliver up to forty terabytes of data, much of which belongs to other non-parties, so that Udio.com can determine whether the data is useful to its theory that the Plaintiff record labels' share of the sound recording market changed after Udio.com began operating in 2024. Rule 45 does not permit that result.

Udio.com's request rests on its fundamental misunderstanding of The MLC's role. The MLC administers royalties for musical works, not sound recordings. Moreover, The MLC does not generate the data Udio.com seeks—it receives copies of monthly usage reports submitted by digital service providers ("DSPs"), which include duplicated information already possessed by the DSPs themselves, including any reported label information.[1] Indeed, The MLC understands that

[1] Declaration of R. Marshall ("Marshall Decl."). ¶¶ 11-13, 16. Udio.com itself describes the reports as made "so that songwriters can get paid." Doc. 2, Mem. in Support, p. 6. Federal regulation treats the data as the DSPs' Confidential Information. 37 C.F.R. § 210.34(b)(1)(i).

Udio.com has already subpoenaed the DSPs covered by its request and negotiated productions with them.[2] In one instance, a publicly-filed Motion to Quash a deposition subpoena discloses that a DSP has provided or is providing aggregate monthly data back to January 1, 2022. Compelling production from The MLC would therefore potentially add a ninth non-party producing copies of the same underlying data.

Udio.com has also failed to demonstrate that The MLC possesses information capable of answering the question it says motivates the subpoena. The record label plaintiffs have already produced market share, royalty, and consumption data dating back to 2019.[3] Meanwhile, The MLC does not possess reliable label data capable of measuring market share across the industry. DSPs report label information only if known, and those fields are frequently left blank.[4] Udio.com was aware of that limitation before serving its subpoena, having described the label field as "optional and may be spotty."[5] Data that cannot reliably identify the owner or distributor of a sound recording cannot reliably measure label market share.

Udio.com nevertheless seeks production because it wants to see whether The MLC's data "gets us there" and asserts that "we will never know unless the MLC provides the data and Udio.com is able to examine it."[6] That is not a showing of relevance, it is a request to search through a non-party's data in the hope that something useful may emerge. Even if produced, the

---

[2] *See* Doc. 1-2, Ex. G, p. 68 of 126 (naming Amazon, Apple, Deezer, Pandora, SoundCloud, Spotify, Tidal, and YouTube); *see also id.*, Ex. D, p. 37 of 126 (Udio.com's counsel referring to "our direct discussions with the DSPs").

[3] Declaration of E. Gonser ("Gonser Decl."), Ex. 1 (50:1-11); *see also id.* (55:9-10) ("over five years of raw market data"). Counsel for the record-label plaintiffs made this representation at a March 12, 2026, discovery conference in the parallel Suno action, in which Udio.com's counsel also represents the defendant. *See* Doc. 2, p. 7 fn. 1.

[4] *See* 37 C.F.R. § 210.27(e)(1)(i)(E) (label names required only "[t]o the extent acquired by the blanket licensee"); Marshall Decl. ¶ 13 (the "Label Name" and "Distributor" fields "are often blank in the reports that The MLC receives").

[5] Doc. 1-2, Ex. D, pp. 38, 44 of 126.

[6] Doc. 1-2, Ex. D, p. 44 of 126; *see also* Doc. 1-2, Campbell Decl. ¶ 7 (describing that email as setting out "the data that Udio.com was seeking"); Doc. 2, Mem. in Support, p. 13.

data would not reveal who owns or distributes recordings associated with blank label fields or why those fields were left blank. Such uncertainty bears directly on whether the requested discovery offers any likely benefit, a consideration required by Rule 26(b)(1).

The burden, by contrast, is substantial. Production would encompass 35 to 40 terabytes of data, require weeks of employee time, necessitate a specialized transfer process, and require continued preservation and security measures for other companies' confidential information.[7] Udio.com offers to pay the costs, but Rule 45 protects non-parties from undue burden as well as undue expense, and reimbursement cannot restore weeks of employee time devoted to litigation in which The MLC is not a party.

Finally, Udio.com contends that the DSPs could not provide the information it seeks.[8] Yet the very communication on which it relies states that Udio.com had "not sought" that data from the DSPs.[9] If Udio.com believes a DSP's production is incomplete, its remedy is to seek additional discovery from that DSP and, if necessary, move to compel. It may not use The MLC, which merely possesses incomplete copies in more burdensome formats, as a back door.

Because Udio.com already has access to more directly relevant sources of information, because The MLC does not possess the reliable market-share data Udio.com claims to need, and

---

[7] Marshall Decl. ¶ 17. Compressing the data to roughly 10 terabytes would add require additional time and effort than the two to three weeks of staff time to prepare the production. *Id.* ¶ 17(a)-(b). The MLC's counsel told Udio.com in July that the production "has never been done before" and that The MLC would "have to consider how long we need to maintain a copy of the production." Doc. 1-2, Ex. D, p. 41 of 126.

[8] Doc. 2, Mem. in Support, p. 8.

[9] Doc. 1-2, Ex. D, p. 37 of 126 ("We have not sought, nor have we received, 'overlapping data' from the DSPs."). The only reason that email gives for why the DSPs could not supply the data is that they lack The MLC's song codes. *Id.* But song codes do not advance any analysis of label market share, because any given song may have been recorded many times by artists on many different labels. Moreover, the database matching The MLC's song codes to DSP sound recording identifiers is part of a public database that Udio.com has access to without any subpoena, without the need for production of any additional DSP information from The MLC. Marshall Decl. ¶ 11, fn. 11.

because the burden imposed on a non-party far outweighs any likely benefit, the motion should be denied.

## BACKGROUND

### I. The Digital Music Royalties Landscape.

Udio.com's insistence on pursuing the subpoena served on The MLC reflects a fundamental misunderstanding of, or indifference to, The MLC's role and the information it actually collects. Udio.com seeks record label information to defend against claims that it infringed copyrighted sound recordings. But The MLC does not administer rights in sound recordings. It administers rights in musical works pursuant to the statutory mechanical blanket license[10] set forth in Section 115 of the U.S. Copyright Act. (Marshall Decl. ¶¶ 3, 5.)[11]

That distinction matters. A musical work and a sound recording are separate copyright interests that are often owned and licensed independently.[12] The MLC exists to facilitate the collection and distribution of royalties for musical works to songwriters, composers, lyricists, music publishers and other musical work administrators, not to record labels or distributors. (Marshall Decl. ¶ 12.) The fact that The MLC receives information from DSPs in connection with its administration of the Blanket License does not mean it possesses reliable information capable of answering Udio.com's stated question regarding record label market share in sound recordings.

[10] A mechanical license is an agreement between the owner of a musical work and someone who seeks permission to reproduce and distribute that musical work. (Marshall Decl. ¶ 3, fn. 1.)
[11] The MLC is a nonprofit organization created under the Orrin G. Hatch—Bob Goodlatte Music Modernization Act of 2018 (the "MMA"), 17 U.S.C. § 101, *et seq.*, and began operating in January 2021. (Marshall Decl. ¶ 3.)
[12] https://www.copyright.gov/music-modernization/sound-recordings-vs-musical-works.pdf.

The MLC's website includes the below illustration of the entities involved in processing digital music royalties for musical works, on the one hand, and sound recordings, on the other (Marshall Decl., ¶ 12):




## II. The Underlying Lawsuit and Related Discovery

Udio.com issued its subpoena to The MLC in *UMG Recordings, Inc., et al. v. Uncharted Labs, Inc., et al.*, Case No. 1:24-cv-03777 (S.D.N.Y.) (the "Udio Lawsuit"). (Doc. 1-2, Ex. G to Decl. of C. Campbell, p. 56 of 126.) The Plaintiff record labels in the Udio Lawsuit allege that "Udio has knowingly infringed Plaintiffs' exclusive rights in copyrighted ***sound recordings***". (Doc. 1-1 (Am. Compl. in *UMG Recordings, Inc.*, 1:24-cv-04777 at Doc. 119), pp. 41-42 of 46, ¶¶ 104, 113 (emphasis supplied); *see also* Doc. 2, Mem. in Support, p. 2 ("claiming that Udio infringed Plaintiff's music sound recording copyrights by copying Plaintiff's sound recordings").)

The Udio Lawsuit does not include any allegations regarding the ownership, infringement, or use of musical works. (Doc. 1-1 (Am. Compl. in the Udio Lawsuit).)

In the related case *UMG Recordings, Inc., et al. v. Suno, Inc., et al.,* No. 1:24-cv-11611 (D. Mass.) (the "Suno Lawsuit"), the Plaintiff record labels likewise allege that "Suno has knowingly infringed Plaintiffs' exclusive rights in copyrighted ***sound recordings***". (M.D. Tenn. Case 3:26-mc-00021, Doc. 1-1, ¶¶ 87, 95.)[13] The Suno Lawsuit also does not include any allegations regarding the ownership, infringement, or use of musical works. (M.D. Tenn. Case No. 3:26-mc-00021 , Doc. 1-1 (Am. Compl. in the Suno Lawsuit).)[14]

As Movant avers here, "all meet and confer efforts with the MLC were conducted jointly across both the underlying [Udio] litigation here and in the separate *Suno* litigation." (Doc. 2, p. 7, fn. 1.)[15] The same attorneys serve as counsel for Udio.com in the Udio Lawsuit and as counsel for Suno in the Suno Lawsuit. The MLC further understands that party discovery across those matters was likewise and in large part coordinated.

To that end, while The MLC lacks visibility into the full scope of party document production and subpoenas served in the Udio Lawsuit (and the Suno Lawsuit), The MLC did locate a public description of at least some of the information Udio.com has received from the Plaintiff record labels and from the DSPs.

---

[13] As described in Respondent's Notice of Related Case (Doc. 10), this subpoena dispute is substantially similar to the dispute in *Suno, Inc. v. Mechanical Licensing Collective*, Case No. 3:26-mc-00021 (M.D. Tenn.).

[14] Under Federal Rule of Evidence 201(b), courts may take judicial notice of facts that are not subject to reasonable dispute, including where the facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This includes "judicial notice of developments in related proceedings in other courts of record." *Chase Bank USA N.A. v. City of Cleveland*, 695 F.3d 548, 553 (6th Cir. 2012) (internal citations omitted).

[15] *See also* M.D. Tenn. Case 3:26-mc-00021, Doc. 9 (Redacted Mem. in Support), p. 7, fn. 1.

**Plaintiffs.** Relevant to this dispute, in a discovery conference conducted on March 12, 2026, before the U.S. Magistrate Judge assigned in the Suno Lawsuit, counsel for the Plaintiff record labels confirmed that they have already produced:

> … a massive amount of data about the market, including royalty data, consumption data and market share data across search streaming services and four social media plat[]forms going back to 2019. …
>
> We've also, in addition to that, given Suno [and, presumably, Udio.com] over 180 executed agreements with these companies, including platform agreements which govern how plaintiffs' music reaches consumers and how plaintiffs' get paid.

(Gonser Decl., Ex. 1 (50:1-11).) Counsel reiterated that Plaintiffs had produced "over five years of raw market data." (*Id.* (55:9-10).) Counsel for Suno at the hearing agreed that Suno (and presumably Udio.com) is "getting stream shared data. We're getting royalty data …" (*Id.* (55:22-23.)

**DSPs.** Since Movant initiated this matter against The MLC, and just days before Suno, Inc. initiated the related 3:26-cv-mc-00021, Apple Inc. ("Apple") filed a motion to quash a deposition subpoena issued in the Suno Lawsuit. (*See* Gonser Decl., Ex. 2.)[16] Among other things, in that filing, Apple disclosed:

> Apple has produced granular and aggregate data on millions of tracks on Apple Music, two sworn declarations from [] Senior Director of Services Operations for Apple, and supporting exhibits addressing … the prevalence of Suno-generated content on Apple Music. (*Id.* at p. 7 of 23.)
>
> On September 25, 2026, … Apple proposed to resolve Suno's entire document subpoena through a supplemental declaration that would … provide aggregate monthly upload and play data from January 1, 2022 to the present—more than 4 years of data … . (*Id.* at p. 14 of 23.)

---

[16] The cited Exhibit is "Non-Party Apple Inc.'s Notice of Motion and Motion to Quash Deposition Subpoena or, in the Alternative, Motion for Protective Order; Memorandum of Points and Authorities in Support Thereof" filed in Case No. 3:26-mc-80303 in the Northern District of California, at Docket Entry 1. Courts may take "judicial notice of developments in related proceedings in other courts of record." *Chase Bank USA N.A.*, 695 F.3d at 553 (internal citations omitted).

Apple also disclosed that in addition to being served multiple subpoenas by Suno, Apple was served at least two document subpoenas by the Plaintiffs. (*See id.* at pp. 10-11 of 23.) By contrast, the Plaintiffs in the Udio Lawsuit and in the Suno Lawsuit have not deemed it necessary—or relevant—to seek information from The MLC.

Thus, to the extent Udio.com needs data that reflects each Plaintiff record label's relative share of the sound recording market from before Udio.com began operating in 2024 through the start of operations, Udio.com appears to already have that data—from the Plaintiffs themselves. To the extent Udio.com needs data that reflects its own presence in the sound recording market, Udio.com appears to already have (or have access to) that data—from the DSPs. To the extent Udio.com believes there is a gap in the productions that The MLC is in a unique position to fill—despite having no reporting or payment relationship with the record labels—Udio.com has not identified that gap. Nor has Udio.com been forthcoming about the extent to which the information they seek by subpoena may be cumulative or duplicative, leaving The MLC to search for publicly-available information in cases that have robust protective orders.

## RELEVANT LAW

In addition to Federal Rules of Civil Procedure 26 and 45 governing the permissible scope of discovery and the use of subpoenas in the discovery process, industry-specific regulations are also important to the resolution of the pending Motion.

**17 U.S.C. § 115.** Section 115 of the U.S. Copyright Act provides for a blanket compulsory mechanical license that permits DSPs to reproduce and distribute digital phonorecords of a musical work *so long as* they follow the requirements set forth in the MMA. The U.S. Copyright Office designated The MLC as the sole entity to administer this license and related payments. (Marshall Decl. ¶ 4.) The U.S. Copyright Office also addressed the question of whether the compulsory

license administered by The MLC under Section 115 includes sound recordings, and responded with a resounding, "No":

> Does a Compulsory License Cover Making and Reproducing a Sound Recording? No. ***Section 115 does not cover sound recordings***. Rather, it covers the reproduction and distribution of nondramatic musical compositions. ***A musical composition and a sound recording are two separate works for copyright purposes***. The author of a musical composition is generally the composer and any lyricist. A sound recording, on the other hand, is the fixation of a series of musical spoken, or other sounds, often of a musical composition. The author of a sound recording is generally the performer(s) whose performance is fixed and the producer who captures and processes the performance to make the final recording. Licenses generally must be obtained separately from the copyright owners of the sound recording and the underlying musical composition. Copyright in a sound recording is not the same as, or a substitute for, copyright in the underlying musical composition.[17]

**37 C.F.R. § 210.27.** The Code of Federal Regulations "prescribes rules for the preparation and delivery of reports of usage and payment of royalties for the making and distribution of … ***musical works*** to the mechanical licensing collective." 37 C.F.R. § 210.27(a) (emphasis supplied). The usage reports must be on both a monthly and an annual basis. *Id.* Section 210.27(c) sets forth the type of information that DSPs are and are not required to include in the usage reports. (*See* Marshall Decl., ¶ 13, fn. 14.)

**37 C.F.R. § 210.34.** Similarly, the Code of Federal Regulations also "prescribes the rules under which the mechanical licensing collective … shall ensure that confidential, private, proprietary, or privileged information received by the mechanical licensing collective … or

---

[17] See Circular 73, "Compulsory License for Making and Distributing Phonorecords," issued by the U.S. Copyright Office and available online at https://www.copyright.gov/circs/circ73.pdf (emphasis supplied). Courts may take judicial notice of Circulars issued by the U.S. Copyright Office. *See Pollstar v. Gigmania Ltd.*, 170 F. Supp. 2d 974, 979 (E.D. Cal. 2000) (taking judicial notice of U.S. Copyright Office Circular 66 under Fed. R. Evid. 201). Courts may also take judicial notice of government websites. *See*, *e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone*, 399 F.3d 651, 655 (6th Cir. 2005) (taking judicial notice of the contents of the website for the National Association of Securities Dealers, Inc.); *Breeden Media LLC v. The Daily Wire, LLC*, 2024 U.S. Dist. LEXIS 233323, *7 (M.D. Tenn. Dec. 27, 2024 (citing *City of Monroe Emps Ret. Sys.*, 399 F.3d at 655).

contained in their records is not improperly disclosed or used … ." 37 C.F.R. § 210.34(a). Of particular relevance to this dispute:

> (1) "Confidential Information" means sensitive financial or business information, including trade secrets or information relating to financial or business terms that could cause competitive disadvantage or be used for commercial advantage, ***disclosed by digital music providers***, … to the mechanical licensing collective or digital licensee coordinator. …

37 C.F.R. § 210.34(b)(1) (emphasis supplied).

The MLC "shall limit disclosure" of that Confidential Information to those "who are engaged in the collective's authorized functions" and who require access to the Confidential Information to perform their duties. 37 C.F.R. § 210.34(c)(1). The MLC is also permitted to fulfill its disclosure obligations under Section 115 of the U.S. Copyright Act by preparing and delivering royalty statements to ***musical work*** copyright owners with the minimum information required and excluding any Confidential Information that does not relate to the recipient. 37 C.F.R. § 210.34(c)(2)(ii) (emphasis supplied). The MLC may further disclose Confidential Information to attorneys in federal court actions "when such disclosure is required by court order and subpoena, subject to an appropriate protective order or agreement." 37 C.F.R. § 210.34(c)(4)(iii).

**<u>RESPONDENT'S POSITION</u>**

Movant has made no effort to articulate the need for information beyond the immense production of raw sound recording market share data already produced in the Udio Lawsuit and the additional productions made by any DSPs. Movant, in fact, did not acknowledge those productions existed in the meet and confer or in its opening brief. Nor has Movant articulated what, if any, gaps in sound recording information remain after robust party discovery and serving subpoenas on the DSPs.

Even if Movant could articulate relevant gaps in information, the idea that The MLC data repository for musical works would have comprehensive, by-label performance information for sound recording usage is inconsistent with the purpose of The MLC under Section 115 of the U.S. Copyright Act. And pulling and transmitting up to 40 terabytes of data from a 6-year period for which piecemeal information exists is not proportional to the value of the information and the burden it imposes on a non-party.

Federal Rule 45 permits parties to subpoena information from non-parties, but not without constraint. The requested information must still meet the standard set forth in Federal Rule of Civil Procedure 26(b)(1) as to relevance **and** proportionality. A party's relative access to relevant information, the importance of the discovery in resolving the issues (including whether it *can* resolve the issues), and whether the proposed discovery burden or expense outweighs its likely benefit are all part of the proportionality inquiry. Fed. R. Civ. P. 26(b)(1).

Additionally, non-parties to litigation should not shoulder an undue burden or bear significant financial or operational costs. *See In re: Modern Plastics Corp.*, 890 F.3d 244 at 251 (6th Cir. 2018) (affirming finding that the subpoena imposed an undue burden or expense on the non-party); *Fitzgerald Truck Parts & Sales, LLC v. United States*, 2023 U.S. Dist. LEXIS 59997, *6 (E.D. Mich. Apr. 5, 2023) (denying motion to compel compliance with subpoena where issuing party had not clearly explained how the requested information answered the "highly relevant" question in the underlying lawsuit and where the issuing party already had access to some of the requested information). "Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs <u>against</u> disclosure." *In re: CareSource Mgmt. Group Co.*, 289 F.R.D. 251,

253 (S.D. Ohio 2013) (emphasis added) (quoting *Am. Elec. Power Co. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999) and granting motion to quash subpoena).

## I. The Information Available from The MLC is Not Relevant to the Underlying Dispute and Certainly Not Proportional to the Needs of the Case.

### A. "Musical Work" (or Song) and "Sound Recording" (or Track) are Terms of Art with Distinct Meanings.[18]

Movant asserts that they have requested "a well-defined set of music streaming data that goes to the heart" of the underlying copyright infringement case. (Doc. 2, Mem. in Support, p. 2.) Movant further asserts that the monthly reports DSPs provide to The MLC "show how each track (i.e., each sound recording) performed in that month, and also provide data about the individual track *and* the music label that owns the related sound recording copyright." (*Id.* (emphasis in original).) Movant is incorrect on both accounts.

In Movant's own words, the Plaintiffs in the underlying dispute allege "that Udio infringed Plaintiff's sound recording copyrights by copying Plaintiff's sound recordings while building its AI models" and that the "outputs of Udio's tool … 'compete with the copyrighted sound recordings that enabled their creation.'" (Doc. 2, Mem in Support, p. 2 (citing First. Am. Compl. in the Udio Lawsuit at Doc. 1-1, ¶ 12).)

As counsel for The MLC explained during the parties' meet and confer efforts and in written response to the subpoena:

> Digital service provider reporting to The MLC concerns musical works not sound recordings. The MLC does not collect data directly from record labels or sound recording distributors, does not maintain data on behalf of record labels or sound recording distributors, and does not have mandatory reporting fields for record label or sound recording distributor information.

---

[18] *See* 17 U.S.C. § 106 (enumerating separate copyright interests in "musical works" and "sound recordings"); https://www.copyright.gov/music-modernization/sound-recordings-vs-musical-works.pdf.

(Doc. 1-2, Ex. I to Decl. of C. Campbell (p. 78 of 126); *see also* Marshall Decl. ¶¶ 12-13.) These attempts by The MLC to clarify and educate Movant date back to the initial subpoena served by Udio.com in April 2026, in which the defined terms demonstrated that Movant was not clear on The MLC's purpose or the information it collects. (*See* Doc. 1-2, Ex. A (Subpoena), pp. 9 of 21; *id.* at Ex. B (Objections to Subpoena), pp. 22-26.)

The MLC also explained that demand for "Label" field data as defined in the subpoena "incorrectly implies that The MLC maintains data for record labels. The MLC does not maintain data for record labels or sound recording distributors. The MLC administers and processes data concerning musical works, not sound recordings." (Doc. 1-2, Ex. I to Decl. of C. Campbell (p. 80 of 126).; *see also* Marshall Decl. ¶ 12.) In response, Movant dismisses the importance of that distinction by citing to federal regulations that require DSPs to report certain information "associated with a given track so long as they have that information." (Doc. 2, p. 13.)

Just as the U.S. Magistrate Judge in the Suno Lawsuit described the case discovery as an "oil spill" around which the Court was attempting to "keep some kind of containment barrier,"[19] so too is it appropriate for this Court to exercise its judgment to "balance the 'right to discovery with the need to prevent fishing expeditions." *Pictsweet Co. v. R.D. Offutt Co.*, 2020 U.S. Dist. LEXIS 262109, *7 (M.D. Tenn. Apr. 23, 2020) (internal citations omitted) (quashing one subpoena and granting a protective order as to another).

### B. The Request is Not Proportional Where Information Regarding a Record Label's Share of the Sound Recording Market is More Readily Available from Other Parties—including the Plaintiffs.

At least two types of entities can provide record label-specific sound recording usage data in a far more suitable format for Movant's described purpose and with orders of magnitude less

[19] Gonser Decl., Ex. 1 (11:5-7).

data and burden than can The MLC: (1) the Plaintiff record labels, who, according to the cited transcript, have already provided "over five years of raw market data" (Gonser Decl., Ex. 1 (55:9-10)); and (2) the digital service providers, on whom The MLC understands Movant has issued subpoenas for overlapping information and, in some instances, has negotiated productions.

Despite Movant suggesting otherwise during the meet and confer in advance of this filing, The MLC now understands that Movant served subpoenas for overlapping information on some or all of the DSPs identified in the subpoena to The MLC. The MLC further understands that Movant has already negotiated productions from some of those DSPs. At least one DSP intimates in its representative's response to learning that Movant was pursing The MLC's subpoena that the DSP production had been resolved. (*See* Doc. 1.2, Ex. E to Decl. of C. Campbell, p. 48 of 126 (Pandora "had been under the impression that this matter had been resolved.").) Another—Apple—has described its offer to produce monthly upload and usage data dating back to January 1, 2022. (Gonser Decl., Ex. 2 (p. 14 of 23).) The MLC has no visibility into the subpoenas issued and served in the Udio Lawsuit beyond those (like this one) that have become the subject of a public dispute.[20] Movant, however, is well aware of the scope of requests made to date and resulting productions. Yet Movant makes no representations regarding having considered the duplicative nature of those requests and productions beyond the blanket assertion that whatever Movant may have received falls short of what Movant (mistakenly) believes The MLC can provide.

Movant is correct that federal regulations prescribe the information that DSPs must report to The MLC. Likewise, federal regulations prescribe the information that DSPs must report to The

---

[20] *See also* Gonser Decl., Ex. 3 (article describing public disputes over subpoenas available online with subscription at https://www.billboard.com/pro/suno-vs-universal-sony-music-ai-lawsuit-companies-subpoenas/).

MLC if and when that information is available. Movant, however, is not correct that The MLC should be required to produce what it knows is incomplete and insufficient data for purposes of sound recording market analysis ***where Udio.com has already received such data from the record labels or from the DSPs.***

## II. Movant Seeks Confidential Information as Defined under 37 C.F.R. § 210.34, Including Confidential Information of Third Parties, further Evidencing that the Request is Not Proportional.

Federal regulations define sensitive financial or business information that is disclosed by DSPs to The MLC as "Confidential Information" entitled to certain protections. 37 C.F.R. § 210.34. The MLC determined it was appropriate to alert the subject DSPs that Movant was seeking such Confidential Information by subpoena. While designation as "Confidential Information" does not mean that the information cannot be obtained by a valid subpoena, the designation (and the burden necessarily imposed on the party from whom the information is sought) is certainly a consideration as to the proportionality of the request.

## III. The Burden of Complying with the Subpoena further Evidences that the Request is Not Proportional.

To reiterate, The MLC opposes enforcement of the subject subpoena as seeking information that is not relevant to the issues and defenses in the Udio Lawsuit. The MLC further opposes enforcement of the subject subpoena as not proportional to the value of the information in light of more readily accessible sources and the nature of the information as confidential under federal regulations.

While standing on those objections, The MLC has attempted to quantify the financial and operational burden of complying with Udio.com's subpoena. The MLC receives and maintains copies of the monthly and annual reporting concerning usage of musical works that the Copyright Act requires DSPs, including Blanket Licensees and Significant Nonblanket Licensees, to provide

to The MLC. (Marshall Decl. ¶ 16.) For The MLC to compile the information Movant seeks from its records back to 2021, the inception of The MLC, information technology employees at The MLC estimate:

- The project would require approximately two to three weeks of staff time to compile the information requested by Movant, including but not limited to generating unique reports containing the information, extracting the information, and transferring the information to Movant. (Marshall Decl. ¶ 17(a).)
- The hourly pay rate of the staff who would be tasked to work on such a project ranges from $150 to $315 per hour. Of course, in addition to the time that staff would need to dedicate to this project, that same staff would be diverted from their regular duties at The MLC. (Marshall Decl. ¶ 17(a).)
- The project would generate approximately 35–40 terabytes of data that, with additional time and effort, could be compressed to approximately 10 terabytes of data. (Marshall Decl. ¶ 17(b).)
- Because of the sheer volume of data, any production would require a specialized method of transfer, which could be affected by an Amazon Web Service (AWS) cloud transfer. One vendor estimated a cost of $5,000 in services to upload the data and at least $100 per terabyte per month in hosting costs. This estimate was heavily caveated on needing to first have a firm picture of the size and format of the data. (Marshall Decl. ¶ 17(c).)
- Because of the Confidential nature of the data (which would be designated as Outside Attorneys' Eyes Only under any protective order), employees with The

MLC would need to continue to monitor, access and/or secure the data for as long as that data was hosted and available to others. (Marshall Decl. ¶ 17(d).)

- As best practice, The MLC would also need to provide DSP-specific sets of the production to the DSPs themselves. The MLC is not yet in a position to estimate the staff time and costs associated with those disaggregated reports having never undertaken a project of this size and scale. (Marshall Decl. ¶ 17(e).)

These estimates for staff time and vendor costs are based on the best information available to date and are subject to change as more information becomes available. (Marshall Decl. ¶ 18.)

## CONCLUSION

Movant asserts that "[t]he truth or falsity of Plaintiff's theory of harm is a question that data can answer—either the appearance of AI-generated music impacted the performance of Plaintiff's sound recordings or it did not." (Doc. 2, Mem. in Support, p. 2.). Whether or not the Movant is correct in this assertion, The MLC is not the party with the data Movant seeks nor the most readily accessible source of such data. The MLC thus respectfully requests the Court to deny Movant's Motion to Enforce the subpoena issued to The MLC in the Udio Lawsuit.

Respectfully submitted,

*/s/ Elizabeth O. Gonser*

Elizabeth O. Gonser (TN Bar No. 26329)
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37206
Telephone: (615) 320-3700
Facsimile: (615) 320-3737

*Attorney for Respondent*
*Mechanical Licensing Collective*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and exact copy of the foregoing document has been filed with the Clerk of Court using the CM/ECF system, which sent notice of such filing to the parties' counsel of record.

This 30th day of October, 2026.

*/s/ Elizabeth O. Gonser*
Elizabeth O. Gonser